Robert SCHUBERT and Rita Schubert, Plaintiffs,

v.

CITY OF RYE, City Council of the City of Rye, Andrew C. Ball, in his individual capacity and as a member of the City Council of the City of Rye, Mack Cunningham, in his individual capacity and as a member of the City Council of the City of Rye, Paula Gamache, in her individual capacity and as a member of the City Council of the City of Rye, Catherine Parker, in her individual capacity and as a member of the City Council of the City of Rye, George S. Pratt, in his individual capacity and as a member of the City Council of the City of Rye, Joe Sack, in his individual capacity and as a member of the City Council of the City of Rye, George J. Mottarella, in his individual capacity and as City Engineer of the City of Rye, Steven Otis, in his individual capacity and as Mayor of the City of Rye, and O. Paul Shew, in his individual capacity and as City Manager of the City of Rye, Defendants.

Case No. 09–CV–6867 (KMK).

United States District Court, S.D. New York.

March 31, 2011.

Steven H. Gaines, Esq., Gaines, Gruner, Ponzini & Novick LLP, White Plains, NY, for Plaintiffs.

Louis G. Corsi, Esq., Cristi L. Luckow, Esq., Landman Corsi Ballaine & Ford PC, New York, NY, Terry A. Rice, Esq., Rice & Amon, Suffern, NY, for Rye, Defendants.

Paul Edward Svensson, Esq., Hodges, Walsh & Slater LLP, White Plains, NY, for Defendant O. Paul Shew.

## OPINION AND ORDER

KENNETH M. KARAS, District Judge:

Robert Schubert ("Schubert") and Rita Schubert (collectively, "Plaintiffs") bring this action, pursuant to 42 U.S.C. § 1983, against the City of Rye, the City Council of the City of Rye ("the City Council"), various members of the City Council in their individual and official capacities, George J. Mottarella ("Mottarella"), in his individual capacity and in his capacity as the City Engineer of the City of Rye, Steven Otis ("Otis"), in his individual capacity and in his capacity as the Mayor of the City of Rye (collectively, "the Rye Defendants"), and O. Paul Shew ("Shew"), in his individual capacity and in his capacity as the City Manager of the City of Rye (collectively, "Defendants"). Plaintiffs allege violations of their rights under the First and Fourteenth Amendments to the Constitution. Plaintiffs also have included a claim of intentional infliction of emotional distress asserted only against Shew. Shew and the Rye Defendants move to dismiss all of Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated herein, both motions are granted.

### I. Background

#### A. Facts

The Court assumes the following facts, as alleged in the Amended Complaint, to be true for purposes of these motions. In 1994, Plaintiffs applied for and obtained a wetlands permit from the City of Rye for the purpose of constructing a wetland garden ("the Wetland Project") on their property. (Am. Compl. ¶ 18.) The Wetland Project was in fact constructed after considerable work and expense. (*Id.* ¶ 20.) Plaintiffs' neighbors, the Gateses, also live on property containing wetlands. (*Id.* ¶ 21.) The Gates property is located on a floodplain, an area especially prone to flooding. (*Id.* ¶ 22.) The Wetland Project was "fed and re-charged by draining surface and ground water through the wetlands located on the Gates Property and the Schubert Property as part of an established watercourse," and any disruption of the flow of the draining water through the watercourse would have a detrimental effect on the operation of the Wetland Project. (*Id.* ¶¶ 23, 24.)

In June 2006, Plaintiffs learned that William Gates ("Gates"), owner of the Gates property, had hired an engineering consultant to address a water drainage issue on his property. (*Id.* ¶ 25.) On June 13, 2006, Schubert wrote to Barbara Cummings ("Cummings"), Chair of the City of Rye Planning Commission (who is not a defendant in this case), with concerns about the potential harm that any actions taken to correct drainage issues on the Gates property could have on the Wetland Project, given the Wetland Project's reliance on the drainage patterns through the established watercourse. (*Id.* ¶ 26.) In August 2006, Gates hired an engineer, Larry Nardecchia ("Nardecchia"), to file an application with the City of Rye for a surface water, sediment, and erosion control permit, for the stated purpose of "repair[ing] drains in easement" located on the Gates property. (*Id.* ¶ 27.) Although the applicable section of the Rye City Code, section 195–4, states that the City Engineer shall refer information regarding such applications to the City Naturalist for a determination of whether the proposed work constitutes a regulated activity and therefore would require a permit, the City Naturalist at the time was on vacation and unavailable, and so the City Engineer, Defendant Mottarella, unilaterally determined that the proposed work on the Gates property, which he deemed to be a repair "in kind," was not a regulated activity and thus did not require a permit. (*Id.* ¶¶ 31–38.) Plaintiffs allege that the Mot-

tarella's determination was motivated by a "special relationship" he had with Nardecchia. (*Id.* ¶¶ 36–39.)[1] Within one week of the completion of the work on the Gates property (the date of which is not provided in the Amended Complaint), the surface and ground water that had previously flowed through the watercourse and charged the Wetland Project was reduced and the Wetland Project essentially dried up. (*Id.* ¶¶ 47, 49.)

Following these events, Plaintiff's complained to the City Council that the work done on the Gates property was improperly conducted without a wetlands permit, a conclusion that was later confirmed by the City Naturalist at the time, Chantal Detlefs ("Detlefs"). (*Id.* ¶¶ 52, 54; *id.* Ex. H.) In a letter to Cummings dated December 12, 2006, Schubert asserted that allowing the work on the Gates property "to proceed without a permit" was "a clear violation of the [Rye City] Code," and he requested "that the City of Rye take action to require that further ... steps be undertaken" to restore the previously-existing drainage pattern. (Decl. of Louis G. Corsi in Further Supp. of Rye Defs.' Mot. to Dismiss ("Corsi Reply Decl.") Ex. 1.) Plaintiffs continued to attend City Council meetings to complain about the allegedly improper determination that the work on the Gates property did not require a wetlands permit, and to call for the City of Rye to rectify the situation which allegedly led to the destruction of the Wetland Project. (Am. Compl. ¶ 61.)

■ In February 2009, in furtherance of these complaints to the City Council, Schubert met with representatives of Congresswoman Nita Lowey, and took part in a telephone conference with Lowey's representatives and Shew. (*Id.* ¶¶ 63–64.) After this conference, Shew placed a telephone call to Schubert, "inquiring as to his health." (*Id.* ¶ 65.) Following this conversation, Shew contacted the Westchester County Medical Center's Comprehensive Psychiatric Emergency Program ("CPEP"), relaying concern for Schubert's mental health. (*Id.* ¶ 66.) Plaintiffs were contacted by CPEP, and, "believing that they could not refuse to participate in the process," were interviewed by a "Mobile Crisis Team" that night. (*Id.* ¶¶ 70–72.) Plaintiffs claim that Shew's call to CPEP was an attempt to retaliate against Plaintiffs for exercising their First Amendment rights in complaining about the City of Rye's conduct with respect to the work on the Gates property. (*Id.* ¶ 73.)[2] Plaintiffs' First Amendment rights were also allegedly violated through Defendants' continued refusal, in response to Plaintiffs' complaints to the City Council, to remedy the situation caused by wrongfully allowing work to proceed on the Gates property.[3] (*Id.* ¶¶ 106–08.)

1. What was "special" about this relationship is not alleged in the Amended Complaint.

2. Plaintiffs also assert a claim solely against Shew for intentional infliction of emotional distress based on the aforementioned conduct. (Am. Compl. ¶¶ 112–16.)

3. While the Amended Complaint does not identify every City Council meeting attended by Schubert, it does allege his "regular attendance" at City Council meetings to "persistent[ly] [] question[]" Defendants' conduct. (Am. Compl. ¶ 62.) In support of their motion to dismiss, the Rye Defendants have submitted recordings and/or minutes of the meetings attended by Schubert documenting his complaints about the work on the Gates property and the City Council's response thereto. For example, at a February 11, 2009 meeting of the City Council, Schubert, and other attendees who appeared on his behalf, asserted that the City Council was obligated to fix the damage on the Schuberts' property. (Decl. of Louis G. Corsi in Supp. of Rye Defs.' Mot. to Dismiss ("Corsi Decl.") Ex. E, at 1–2.) In response, members of the City Council asserted that, although they were sympathetic to Schubert's predicament, the City Engineer had made a fair determination that no permit

was required for the work on the Gates property. (*Id.* at 2.) However, they wanted to avoid the "blame game" and "focus ... on [finding] solutions." (*Id.*) They also offered to arrange a mediation between Schubert and Gates to resolve the issue. (*Id.*)

At another City Council meeting held February 25, 2009, following the City Council's receipt of Detlefs' letter stating her opinion that the work on the Gates property was mistakenly allowed to proceed without a wetland permit, the Mayor expressed his concern about the issues addressed by Detlefs, including that certain City of Rye officials knew that the City Engineer's initial determination was improper. (*Id.* Ex. G, at 2.) The Mayor suggested that an outside hydrologist be brought in to investigate, as "everyone [was] eager to get answers and find a solution for Mr. Schubert." (*Id.*) Most of the other City Council members supported this idea, but Defendant Sack expressed his opinion that before spending any money on a hydrologist, an independent investigation should be conducted into the serious allegations that City of Rye officials knew of the impropriety of the City Engineer's determination and yet took no action on it. (*Id.* at 2–3.) Still, the motion to spend money to hire an outside hydrologist was made and adopted, despite protestations from some individuals attending the meeting who felt that there were other, more pressing matters on which taxpayer money should be spent. (*Id.* at 4–5.) Schubert expressed his support of the proposed hydrologist investigation. (*Id.* at 5.)

At meetings on March 11 and April 29, 2009, both Schubert and former Mayor John Carey, who had been appointed by the City Council to investigate the circumstances surrounding the work on the Gates property (*id.* at 6–7), voiced concerns about the manner in which the hydrologist investigation was being conducted. At the April 29 meeting, Mayor Otis noted that Schubert had made a request for his own retained hydrologist to have access to City-owned property for an examination, and he "indicated that the City would cooperate." (*Id.* Ex. M, at 4.) This willingness to cooperate was reiterated at a May 13, 2009 City Council meeting, where Mayor Otis agreed to set aside time at a future meeting to hear the findings of Schubert's retained team of experts. (*Id.* Ex. N, at 4–5.) Schubert demanded access to the Gates property, but was told that the City Council could not force Gates to allow Schubert access for his investigation. (*Id.* at 5.)

A representative from the hydrology firm retained by Schubert gave a presentation at a June 10, 2009 City Council meeting, at which he opined that it was likely that the work done on the Gates property affected the water flow to Schubert's property, contrary to the conclusion reached by the firm contracted by the City of Rye. (*Id.* Ex. Q, at 9–10.) The City Council noted that the results of its expert's investigation were not wrong merely because a different conclusion was reached by Schubert's expert. (*Id.* at 12.) On July 15, 2009, Schubert pleaded with the City Council to take action to fix the damage done to his property. (*Id.* Ex. R., at 11–12.) Defendant Sack stated that the situation was basically at a standstill given the conflicting expert reports, and unless any new developments came to light—including any new information that might be gleaned from an evaluation of the Gates property, which neither the City Council nor Schubert had legal access to—nothing further could be done for Schubert. (*Id.* at 12.) Mayor Otis ended the discussion by noting "that Mr. Schubert and the Council have differing opinions about the City's responsibilities in the matter." (*Id.*)

The Parties' Memoranda of Law are largely silent on the extent to which the Court may consider the City Council meetings in deciding the instant motions. Defendants rely on *Condit v. Dunne*, 317 F.Supp.2d 344, 357 (S.D.N.Y.2004), in which Judge Leisure decided he could properly consider a recording of a radio show and transcripts of television broadcasts in a slander case without converting defendant's motion to one for summary judgment. (Rye Defs.' Mem. of Law in Supp. of Their Mot. to Dismiss ("Rye Defs.' Mem.") 7). Distinguishable though that case is, Plaintiffs do not object to Defendants' reliance on the recordings and minutes of the City Council meetings. On the contrary, they embrace these materials as further substantiating their claims. (Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss ("Pls.' Mem.") 5–8). Thus, the Court will consider these publicly available materials, but for a limited purpose and even though doing so does not change the outcome of this ruling.

First, Plaintiffs refer to and rely on these proceedings in their Amended Complaint (and in their opposition to the motions). In fact, these proceedings form the core of Plaintiffs' allegations against the City Council Defendants, and there is no apparent dispute as to their authenticity. *See Dunes v. Saugatuck Twp.*, No. 10–CV–210, 2011 WL 121565, at *2 (W.D.Mich. Jan. 12, 2011) (denying motion to

Plaintiffs also claim that in order to avoid liability for improperly allowing the work on the Gates property to proceed without a wetlands permit, the City of Rye and various City officials attempted to "cover up" the wrongdoing, first by agreeing to maintain that the work on the Gates property did not directly cause the destruction of the Wetland Project, and if it did, that it was a "matter between neighbors" (*id.* ¶¶ 55–60), then by hiring a hydrologist, Kevin J. Phillips, allegedly to refute Plaintiffs' contention that the work on the Gates property was the direct cause of the destruction of the Wetland Project, (*id.* ¶¶ 74–77). Plaintiffs assert that these actions violated their First Amendment rights, as well as their substantive and procedural due process rights under the Fourteenth Amendment. (*Id.* ¶¶ 74–94, 106–08.)[4]

---

strike minutes of meeting at which town board adopted zoning amendment that were integral to the complaint and a public record, where the complaint detailed the process leading to the amendment); *Kreiss v. McCown DeLeeuw & Co.*, 37 F.Supp.2d 294, 298 n. 3 (S.D.N.Y.1999) (considering documents not attached to complaint, but which were integral to plaintiffs' claims, and which plaintiffs had notice of and relied upon). Second, the minutes and recordings of the City Council meetings are matters of public record and therefore are the types of materials of which a court may take judicial notice. *See Catholic League for Religious & Civil Rights v. City & Cnty. of San Francisco*, 464 F.Supp.2d 938, 941 (N.D.Cal.2006) (taking judicial notice of resolutions and bills before the city board of supervisors, as "matters of public record"); *Meeker v. Belridge Water Storage Dist.*, No. 05–CV–603, 2005 WL 6246803, at *7 (E.D.Cal. May 3, 2005) (taking judicial notice, over plaintiffs' objection, of minutes from irrigation district's board meeting, finding that minutes were public records); *Evans v. N.Y. Botanical Garden*, No. 02–CV–3591, 2002 WL 31002814, at *4 (S.D.N.Y. Sept. 4, 2002) (noting that court may take judicial notice of "records of state administrative procedures, as these are public records, without converting a motion to dismiss to one for summary

### B. Procedural History

Plaintiffs filed the initial Complaint on August 4, 2009. (Dkt. No. 1.) Shew submitted his answer on October 2, 2009. (Dkt. No. 7.) Upon leave of the Court, Plaintiffs filed their Amended Complaint on February 2, 2010. (Dkt. No. 16.) Shew and the Rye Defendants separately filed motions to dismiss, which were both fully submitted on May 21, 2010. (Dkt. Nos. 18, 20.)

## II. Discussion

### A. Standard of Review

"On a Rule 12(b)(6) motion to dismiss a complaint, the court must accept a plaintiff's factual allegations as true and draw all reasonable inferences in [the plaintiff's] favor." *Gonzalez v. Caballero*, 572 F.Supp.2d 463, 466 (S.D.N.Y.2008); *see also Ruotolo v. City of New York*, 514 F.3d

---

judgment"); *Sumner Peck Ranch, Inc. v. Bureau of Reclamation*, 823 F.Supp. 715, 724 (E.D.Cal.1993) (considering "the minutes of [ ] Board meetings, which may be judicially noticed as public records in a motion to dismiss"). Third, the Court will consider these materials for the limiting purposes of determining the fact of the meetings and the actions taken by the relevant parties, not for the truth of any statements made during these proceedings. *See Brown v. City of Pittsburgh*, 586 F.3d 263, 267 n. 2 (3d Cir.2009) (affirming district court's consideration of minutes of city council's public meetings where there was no challenge to the authenticity of the minutes themselves, and where considered for the limited purpose of the fact of what happened during those meetings, and not for the truth of the statements made). Thus, the Court concludes that these materials may be considered in deciding the instant motions to dismiss, without converting them into summary judgment motions.

4. In addition to these claims, the Amended Complaint alleged a violation of Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment. This claim, however, was withdrawn in a letter from Plaintiffs to the Court. (Letter from Denise M. Cossu, Esq., to the Ct. (Feb. 19, 2010).)

184, 188 (2d Cir.2008) ("We review *de novo* a district court's dismissal of a complaint pursuant to Rule 12(b)(6), accepting all factual allegations in the complaint and drawing all reasonable inferences in the plaintiff's favor." (internal quotation marks omitted)). In adjudicating a Rule 12(b)(6) motion, a district court " 'confines its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken.' " *Meisel v. Grunberg,* 651 F.Supp.2d 98, 107 (S.D.N.Y. 2009) (alteration omitted) (quoting *Leonard F. v. Isr. Disc. Bank of N.Y.,* 199 F.3d 99, 107 (2d Cir.1999)). "The court may ... consider matters of which judicial notice may be taken, even if the corresponding documents are not attached to or incorporated by reference in the complaint." *Munno v. Town of Orangetown,* 391 F.Supp.2d 263, 268 (S.D.N.Y.2005); *see also Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir.1991) (holding that district court properly took judicial notice of public documents filed with the SEC). In the motion to dismiss context, however, a court should generally take judicial notice "to determine what statements [the documents] contain[ ] ... not for the truth of the matters asserted." *Kramer,* 937 F.2d at 774.

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (alteration, citations, and internal quotation marks omitted). Instead, the Supreme Court has emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.,* and that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, 127 S.Ct. 1955. A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570, 127 S.Ct. 1955. If a plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Id.*; *see also Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009) ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " (alteration in original) (citation omitted) (quoting Fed.R.Civ.P. 8(a)(2))).

### B. *Immunity*

Plaintiffs' first three causes of action allege violations of the First and Fourteenth Amendments. Specifically, the first two causes of action allege violations of Plaintiffs' substantive and procedural due process rights, respectively, under the Fourteenth Amendment; the third cause of action alleges a violation of the First Amendment.

#### 1. *Absolute Immunity*

■ Before turning to the question of whether Plaintiffs state any claim against Defendants, the Court will address the issue of absolute immunity, which is asserted by all of the individual Defendants, except Shew and Mottarella, *See Mangiafico v. Blumenthal,* 471 F.3d 391, 394 (2d Cir.2006) (noting that absolute immunity "defeats a suit at the outset" (quoting *Imbler v. Pachtman,* 424 U.S. 409, 419 n. 13, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976))). The first claim made by these Defendants is

that they are absolutely immune because at all relevant times they were acting in their legislative capacity. "The common-law doctrine of official immunity governs civil liability for public servants acting in their legislative capacity." *Rini v. Zwirn,* 886 F.Supp. 270, 280 (E.D.N.Y.1995); *see also Sup. Ct. of Va. v. Consumers Union of the United States, Inc.,* 446 U.S. 719, 732–33, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980) (recognizing immunity of state legislatures from § 1983 actions for both damages and equitable relief). The Supreme Court has extended this doctrine to local legislators. *See Bogan v. Scott–Harris,* 523 U.S. 44, 49, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998) ("Because the common law accorded local legislators the same absolute immunity it accorded legislators at other levels of government, and because the rationales for such immunity are fully applicable to local legislators, we now hold that local legislators are likewise absolutely immune from suit under § 1983 for their legislative activities."); *see also Orange Lake Assocs. v. Kirkpatrick,* 21 F.3d 1214, 1224 (2d Cir.1994) (noting that absolute legislative immunity extends to town board members in New York State); *S. Lyme Prop. Owners Ass'n v. Town of Old Lyme,* 539 F.Supp.2d 547, 558 (D.Conn.2008) (noting that legislative immunity extended to municipal zoning commission members).

■■■■ However, a public official named as a defendant in his or her official capacity in a § 1983 action is not entitled to personal immunity defenses, but only the immunities available to the governmental entity, *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) (citing *Hafer v. Melo,* 502 U.S. 21, 25–26, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991)), and it is well settled that a municipal entity has no claim to such immunity from § 1983 liability, *Morris v. Lindau,* 196 F.3d 102, 111 (2d Cir.1999). Therefore, the individual Defendants in their official capacities may not assert the defense of absolute immunity. *See Almonte v. City of Long Beach,* 478 F.3d 100, 106 (2d Cir.2007) ("Immunity, either absolute or qualified, is a *personal* defense that is available only when officials are sued in their individual capacities; '[t]he immunities [officials] enjoy when sued personally do not extend to instances where they are sued in their official capacities.'") (quoting *Morris,* 196 F.3d at 111 (emphasis and alterations in original)).

■■■■ But, "[w]here the governmental entity can itself be held liable for damages as a result of its official policy, a suit naming the legislators in their official capacity is redundant." *Rini,* 886 F.Supp. at 281 (citing *Kentucky v. Graham,* 473 U.S. 159, 166–67 & n. 14, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)). Here, all of the individual Defendants are named in their personal *and* official capacities (including Shew and Mottarella), along with the municipal entities, the City of Rye and the City Council of the City of Rye.[5] At least as to the Mayor, the City Council, and the City Council members, Plaintiffs seek damages as a result of the City of Rye's alleged official policy of not remedying the situation of which Plaintiffs complain.[6] In

---

5. Although Defendants point out that Defendant Sack is named in the Amended Complaint only in his official capacity (Rye Defs.' Mem. of Law in Opp'n to Pls.' Submission and in Further Supp. of Their Mot. to Dismiss ("Rye Defs.' Reply") 1; *see also* Am. Compl. ¶ 14 (naming Sack in only his official capacity)), the caption of the Complaint names Sack in his individual and official capacities. Therefore, for purposes of these motions, the Court considers Plaintiffs to have named Sack in both capacities.

6. Official policy for these purposes "does not mean that the plaintiff must show that the municipality had an explicitly stated rule or regulation," although "a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy."

other words, the injuries that Plaintiffs have allegedly suffered came as a result of an alleged official policy of the municipal entity. Therefore, the City of Rye is the real party in interest, *Graham*, 473 U.S. at 165–66, 105 S.Ct. 3099, and the official-capacity suits against the Mayor, the City Council, and the members of the City Council must "be treated as [ ] suit[s] against the [City of Rye] and not [as] suit[s] against the official[s] personally," *Anemone v. Metro. Transp. Auth.*, 410 F.Supp.2d 255, 264 n. 2 (S.D.N.Y.2006) (alterations and internal quotation marks omitted). *See also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ("[O]fficial-

capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent."). Accordingly, the official-capacity suits against the Mayor, the City Council, and the members thereof, are dismissed. *See Carmody v. Vill. of Rockville Ctr.*, 661 F.Supp.2d 299, 329 (E.D.N.Y.2009) (noting that "courts have routinely dismissed ... claims against individuals named in their official capacity as redundant and an inefficient use of judicial resources" (internal quotation marks omitted)); *Anemone*, 410 F.Supp.2d at 264 n. 2 (same).[7]

 The individual Defendants are also named in the Amended Complaint in their individual capacities, and they move to dismiss these claims based on absolute legislative immunity.[8] As noted, unlike

---

*DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir.1998) (internal quotation marks omitted). Because the Mayor and the City Council function at the policy-making level, their actions may have the force of official policy. *See Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 449 (2d Cir.1980) ("Surely the mayor is the one city official whose edicts and acts represent municipal policy, especially when he joins other high-ranking municipal officers in devising and successfully implementing the plan.").

7. The Court does not reach the same conclusion as to Defendants Shew and Mottarella. A municipality cannot be held liable under § 1983 on a respondeat superior theory. *Monell*, 436 U.S. at 690–91, 98 S.Ct. 2018. Instead, a constitutional violation can be imputed to the municipality only when the plaintiff proves "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (internal quotation marks omitted). As noted above, actions taken by policy-making officials can result in municipal liability even in the absence of a formal municipal policy. *Id.* However, only those municipal officials who have "final policymaking authority," itself a question of state law, may by their actions subject the government to § 1983 liability. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).

Here, Plaintiffs make no argument suggesting why Mottarella or Shew are final policymakers under state law, and their allegations do not hint accordingly. *See Manemeit v. Town of Branford*, No. 04–CV–1353, 2009 WL 1743749, at *4 (D. Conn. June 18, 2009) (holding that town fire chief was not a policymaker for *Monell* purposes). Indeed, as Plaintiffs allege, Mottarella did not have final decisionmaking authority over land-use matters, as the Town Code itself provides that he may be required to consult with, among others, the City Naturalist on certain issues. Similarly, nothing about the allegations regarding Shew suggests that under state law he had any final decisionmaking authority over matters relevant to this action. *See Jackson v. Jimino*, No. 03–CV–722, 2007 WL 189311, at *19 (N.D.N.Y. Jan. 19, 2007) (concluding that the absence of sufficient evidence regarding legal authority of county executive over employment decisions which were the subject of the § 1983 action created question of fact regarding scope of authority as policymaker). These may be matters for another day, but on the pleadings, the Court cannot say that the claims against Mottarella and Shew in their official capacities are redundant with the claims against the City of Rye.

8. Defendants note, and the Court agrees, that Mottarella is not entitled to absolute legislative immunity because he was not at any time engaged in legislative activity. (Rye Defs.' Mem. 23.) Because the allegations against Shew do not involve conduct that can remote-

claims based on their official capacities, absolute immunity may protect defendants performing legislative functions from being sued in their individual capacities. Courts apply a functional test to determine whether an act is legislative, which focuses "not on the official's identity, or even on the official's motive or intent, but on the nature of the act in question." *State Emps. Bargaining Agent Coal. v. Rowland,* 494 F.3d 71, 82 (2d Cir.2007). Put simply, "[a]bsolute legislative immunity attaches to all actions taken 'in the sphere of legitimate legislative activity.'" *Bogan,* 523 U.S. at 54, 118 S.Ct. 966 (quoting *Tenney v. Brandhove,* 341 U.S. 367, 376, 71 S.Ct. 783, 95 L.Ed. 1019 (1951)).[9] In making the determination whether an act, or a course of conduct, is within the "sphere of legitimate legislative activity," two factors are relevant.

First, it is relevant whether the defendants' actions were legislative 'in form,' *i.e.,* whether they were 'integral steps in the legislative process.' Second, it may also be relevant whether defendants' action were legislative 'in *substance,*' *i.e.,* whether the actions 'bore all the hallmarks of traditional legislation,' including whether they 'reflected ... discretionary policymaking decisions implicating the budgetary priorities of the [government] and the services the [government] provides to its constituents.

*Rowland,* 494 F.3d at 89 (alterations in original) (citation omitted) (quoting *Bogan,* 523 U.S. at 55–56, 118 S.Ct. 966).

 Here, Defendants claim that they were engaged in legislative activity when they dealt with Schubert's complaints

about the work done on the Gates property, for example, when they voted to retain a hydrologist to investigate the matter. (Rye Defs.' Mem. of Law in Supp. of their Mot. to Dismiss ("Rye Defs.' Mem.") 21–23.) However, while these actions may have been taken mostly by legislators (the Council Members), these actions were not part of the sphere of legislative activity; that is, they did not appear to be legislative either in form or substance. For example, moving Defendants did not engage in some broad policy debate about changing or enacting land use regulations or laws. Rather, Defendants' alleged actions involved existing land-use policies as applied to a single resident (Gates), and whether actions that resident was allowed to take by City officials adversely affected another resident (Schubert). In other words, Defendants were refereeing a dispute between neighbors in the context of already-existing land-use policies. They were not reacting to these neighbors' complaints seeking the adoption of new land-use policies. In so acting, Defendants, therefore, were not protected by legislative immunity. *See Scott v. Greenville Cnty.,* 716 F.2d 1409, 1423 (4th Cir.1983) (holding that county council's actions in dispute over building permit were not "part and parcel of legislative deliberations on a zoning policy issue," but rather involved non-legislative, enforcement responsibilities to which absolute legislative immunity did not attach); *cf. S. Lyme Prop. Owners Assoc.,* 539 F.Supp.2d at 558–59 (distinguishing between *adopting* land-use regulations and policies governing their enforcement, which is legislative, and *enforcing* land-use regulations, which is not legislative). None of this is changed by the mere fact

---

ly be considered legislative activity, he is similarly not entitled to absolute legislative immunity.

**9.** "Legislative immunity shields from suit not only legislators, but also officials in the execu-

tive and judicial branches when they are acting 'in a legislative capacity.'" *Rowland,* 494 F.3d at 82 (quoting *Bogan,* 523 U.S. at 55, 118 S.Ct. 966).

that the City Council members, for example, *voted* to retain a hydrologist to explore the impact of the Gates work on Plaintiffs' property. *See Roberson v. Mullins*, 29 F.3d 132, 134 n. 3 (4th Cir.1994) (noting that the mere act of voting is not dispositive in determining whether a governmental unit's actions are legislative); *Trevino ex rel. Cruz v. Gates*, 23 F.3d 1480, 1483 (9th Cir.1994) ("[A]lthough a local legislator may vote on an issue, that alone does not necessarily determine that he or she was acting in a legislative capacity." (internal quotation marks omitted)). Therefore, the Court concludes that the alleged actions of the Mayor and the City Council with respect to the Gates and Schubert properties were not legislative, and that these Defendants are not absolutely immune from Plaintiffs' claims.

### 2. Qualified Immunity

▮▮▮▮ In addition to absolute immunity, each of the individual Defendants (except Shew [10]) claims that they are entitled to qualified immunity. "Qualified immunity shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).[11] In the Second Circuit, "a right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlaw-

ful." *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir.2004) (alterations and internal quotation marks omitted). A government official may be entitled to qualified immunity if either his "conduct did not violate plaintiff's clearly established rights or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." *Mandell v. Cnty. of Suffolk*, 316. F.3d 368, 385 (2d Cir.2003). Additionally, "[t]he protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (internal quotation marks omitted).

Qualified immunity is "an immunity from suit rather than a mere defense to liability," and "is effectively lost if a case is erroneously permitted to go to trial." *Id.* (internal quotation marks omitted). Accordingly, the applicability of this doctrine should be resolved by a court "at the earliest possible stage in litigation." *Id.* (internal quotation marks omitted). However, "the Second Circuit has emphasized that 'a defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route.'" *Soundview Assocs. v. Town of Riverhead*, 725 F.Supp.2d 320, 345 (E.D.N.Y.2010) (quoting *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004)). Further, "in such situations, [a] 'plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense.'" *Id.*

---

**10.** Because "[q]ualified immunity is an affirmative defense," *Amore v. Novarro*, 624 F.3d 522, 529 (2d Cir.2010), and Shew has not asserted it, the Court will not consider its applicability as to him.

**11.** The defense of qualified immunity is unavailable to the County. *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (noting that qualified immunity is unavailable "in an action against a municipality").

(quoting *Holmes v. Poskanzer*, 342 Fed. Appx. 651, 652 (2d Cir.2009) (summary order)).

▇▇▇ Plaintiffs assert that Mottarella's allegedly improper determination to allow the Gates work to proceed without consulting the City Naturalist (and therefore without a permit) violated their due process rights under the Fourteenth Amendment. However, Mottarella argues that he is entitled to qualified immunity because his determination that a wetlands permit was not necessary for the work on the Gates property involved an "exercise of discretion," which made it "objectively reasonable" for him to believe that this determination did not violate any of Plaintiffs' "clearly established" constitutional rights.[12] (Rye Defs.' Mem. 25.) Of course, Plaintiffs allege that Mottarella exercised any discretion he might have had for improper reasons—the unspecified "special relationship" Mottarella purportedly had with Nardecchia, Gates's engineer. According to Plaintiffs, Mottarella's conduct was arbitrary and therefore violated Plaintiffs' rights to substantive and procedural process.

▇▇▇ Taking Plaintiffs' allegations as truthful for these purposes, the Court nonetheless finds that Mottarella is entitled to qualified immunity. As discussed below, this conclusion first derives from the Court's determination that Plaintiffs' substantive and procedural due process

claims against Mottarella (and the other Defendants) fail because Plaintiffs have failed to allege a protectable property interest. Second, Mottarella is entitled to qualified immunity because Plaintiffs have failed to establish that, objectively speaking, Mottarella was on notice that his actions violated the constitutional rights claimed by Plaintiffs. Qualified immunity serves to "ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful." *Saucier v. Katz*, 533 U.S. 194, 206, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Thus, before liability attaches to a public official's actions, "the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In this analysis, the relevant factors are "(1) whether the right in question was defined with reasonable specificity; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her actions were unlawful." *McEvoy v. Spencer*, 124 F.3d 92, 97 (2d Cir.1997) (internal quotation marks omitted). "A defendant pleading qualified immunity on a motion to dismiss is entitled to prevail if the allegations in the complaint fail to state a claim of violation of clearly established law." *Id.* (internal quotation marks omitted).[13]

**12.** The Supreme Court in *Pearson* modified the two-step test outlined in *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), which had previously guided inquiries into the availability of qualified immunity. Under the *Saucier* approach, a court was first to determine whether the facts alleged or shown by a plaintiff constituted a violation of a constitutional right. *Pearson*, 129 S.Ct. at 815–16. If the first step was satisfied, then the court determined whether the right in question was "clearly established" at the time of the alleged misconduct. *Id.* at 816. Under *Pearson*, courts are no longer

bound to this sequential analysis, but rather may address the second prong first if it would be more expedient to do so, depending on the facts of a case. *Id.* at 818. Here, the Court first addresses whether Defendants' alleged conduct violated clearly established law, because it will permit the suit to "be disposed of more readily." *Id.* (internal quotation marks omitted).

**13.** It bears noting that "officials can still be on notice that their conduct violates established law even in novel factual circum-

In this case, Plaintiffs must plausibly allege that Mottarella knew he would be violating Plaintiffs' due process rights by improperly giving a free pass to the Gates work, or, put another way, that Plaintiffs' due process rights would be violated by not requiring the City Naturalist to evaluate the Gates work proposal to determine if the Gates proposal required a permit. Yet, Plaintiffs have failed to plead or otherwise demonstrate that the law was clearly established, at the time Mottarella acted, that there existed a due process right requiring public officials to enforce land-use regulations against another property owner. Indeed, in *Gagliardi v. Village of Pawling*, 18 F.3d 188 (2d Cir.1994), the Second Circuit observed that claims such as those brought by Plaintiffs here—that there is a property interest in the enforcement of land use regulations with respect to another's property—are "rather unique, since most due process challenges to land use regulations involve a property owner who has been denied a building permit or a site plan or has some other restriction placed on his own property." *Id.* at 192. In *Gagliardi*, while the court assumed, without deciding, that a property owner could have a "protected interest in the enforcement of the zoning laws against an adjoining property," the court nonetheless ruled that the plaintiffs had not established an entitlement to the enforcement decisions they sought in that case. *Id.* at 192. Because municipal officials retain discretion over enforcement decisions generally, and because the specific land-use regulations provided the officials with broad discretion, the *Gagliardi* court concluded that plaintiffs had "[n]o due process right" to "demand that the Municipal Defendants enforce the zoning laws." *Id.*[14] In the wake of *Gagliardi*, the lower courts have found that there is no due process right to rigorous enforcement of land-use laws. *See, e.g., Nemeth v. Vill. of Hancock*, No. 10–CV–1161, 2011 WL 56063, at *4 (N.D.N.Y. Jan. 7, 2011) (holding that plaintiffs "have no constitutionally protected property interest in the 'benefit' of a Zoning code violation being issued by the Defendants against the [neighbors'] use of ... their property."). And, most relevant here, at least one court has determined that public officials are entitled to qualified immunity in the face of allegations that they improperly enforced land-use rules against other property owners, finding the absence of any clearly established right of one property owner to have a public entity enforce land-use law against another property owner. *See, e.g., Wiltzius v. Town of New Milford*, 453 F.Supp.2d 421, 435 (D.Conn.2006) ("While this court does not dispute Wiltzius' claim that the extension or enlargement of nonconforming structures is clearly prohibited under state law, there is no Circuit or Supreme Court precedent that would place Board members on notice that their actions, in granting such an extension or enlargement, would violate an adjoining property [owner's] substantive due process rights."). Therefore, Mottarella is entitled to the protection of qualified immunity.

stances." *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).

**14.** In support of this conclusion, *Gagliardi* cited *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) and *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), both of which stand for the general proposition that due process is a limitation on government authority, and not a vehicle to require the government to exercise its authority to act. *See DeShaney*, 489 U.S. at 195, 109 S.Ct. 998 ("The [Due Process] Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security."); *Heckler*, 470 U.S. at 832, 105 S.Ct. 1649 (noting that refusal to act "generally does not [result in] exercise [of] coercive power over an individual's liberty or property rights." (emphasis omitted)).

The Mayor and the City Council members also claim that they are entitled to qualified immunity. Plaintiffs allege that the Mayor and the City Council retaliated against them for exercising their First Amendment rights at City Council meetings, where they requested redress for the damage done to their property from the Gates work that Plaintiffs claimed was improperly approved by Mottarella. This alleged retaliation was accomplished by arbitrarily and unreasonably hiring a hydrologist to refute Plaintiffs' assertions that the drainage work on the Gates property damaged Plaintiffs' property and thereafter refusing to rectify Plaintiffs' property damages. (Am. Compl. ¶¶ 74–77, 106–08.) These actions also allegedly violated Plaintiffs' Fourteenth Amendment due process rights. Defendants counter that they were not retaliating against Plaintiffs, but rather that they merely disagreed with Plaintiffs about the extent of the City of Rye's obligations with respect to repairing the damage to Plaintiffs' property. (Rye Defs.' Mem. 20–21.) They contend that their actions were reasonable and in any event did not violate Plaintiffs' rights under the First Amendment, and thus that they are entitled to qualified immunity.

As discussed in detail below, the Court agrees with Defendants. While Plaintiffs undoubtedly had a constitutionally protected right to complain to the City Council about the situation surrounding their property, the right to petition the government does not include a right to require certain government action, or convert a government entity's determination not to act into a prima facie case of First Amendment retaliation. And, Plaintiffs allegations that the Mayor and the City Council Defendants failed to remedy the previously approved work on the Gates property to retaliate against Plaintiffs for complaining about this work are vague and contradictory. It was well within the City Council's discretion to act or not act on the basis of Plaintiffs' grievances concerning their property, and the Court finds that Plaintiffs have failed to establish that Defendants acted in violation of Plaintiffs' First Amendment and Due Process rights. Therefore, the Mayor and the City Council members are entitled to qualified immunity, and the individual-capacity suits against them are dismissed.

### C. Substantive Due Process

In their first cause of action, Plaintiffs allege Defendants violated their substantive due process rights under the Fifth and Fourteenth Amendments. In particular, Plaintiffs allege that Mottarella violated Plaintiffs* substantive due process rights when he failed to refer the Gates permit application to the City Naturalist. (Am. Compl. ¶ 81.) Plaintiffs further allege that the other Defendants are responsible for violating their substantive due process rights by allowing the work to proceed on the Gates property, thus effectively "revoking ... Plaintiffs' wetland permit." (*Id.* ¶¶ 82–83.) [15]

In the context of a substantive due process claim in a case such as this, that involves questions of local land-use management, the Second Circuit has been "mindful of the general proscription that federal courts should not become zoning boards of appeal to review nonconstitutional land[-]use determinations by the [C]ircuit's many local legislative and administrative agencies." *Zahra v. Town of Southold,* 48 F.3d 674, 679–80 (2d Cir.

---

**15.** Plaintiffs claim that these alleged actions also violated their rights under the Fourth Amendment. (Am. Compl. ¶¶ 85–86.) However, since the Amended Complaint contains no allegation of a search or seizure by any of the Defendants, this Fourth Amendment claim is dismissed.

1995) (alterations in original) (internal quotation marks omitted). Thus, "a party asserting a deprivation of substantive due process must first establish a valid property interest within the meaning of the Constitution." *Crowley v. Courville*, 76 F.3d 47, 52 (2d Cir.1996); *see also Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 503 (2d Cir.2001). The benefit or property interest which triggers federal constitutional protection is derived from independent sources, such as state law. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Kraebel v. N.Y.C Dep't of Hous. Pres. & Dev.*, 959 F.2d 395, 404 (2d Cir.1992). "Second, the party must demonstrate that the defendant acted in an arbitrary or irrational manner in depriving [the party] of that property interest." *Crowley*, 76 F.3d at 52; *see also Ferran v. Town of Nassau*, 471 F.3d 363, 369–70 (2d Cir.2006) (noting that plaintiff must establish that government misconduct was "arbitrary," "conscience-shocking," or "oppressive in the constitutional sense," and not merely "incorrect or ill-advised" (internal quotation marks omitted)).

■■■ To satisfy the first prong and establish a constitutionally cognizable property interest, a plaintiff must allege a " 'legitimate claim of entitlement' to the benefit in question." *Zahra*, 48 F.3d at 680 (quoting *RRI Realty Corp. v. Inc. Vill. of Southampton*, 870 F.2d 911, 915 (2d Cir.1989)); *see also Bd. of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (holding that to have a "property" interest under the Fourteenth Amendment's due process clause, "a person clearly must have more than an abstract need or desire for it," or "more than a unilateral expectation of it," but must instead "have a legitimate claim of entitlement to it"); *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 784 (2d Cir.2007) (applying clear entitlement test to cases involving land-use benefits); *Yale Auto Parts, Inc. v. Johnson*, 758 F.2d 54, 58 (2d Cir.1985) (noting that a property owner has clear entitlement to a land-use benefit where, "absent the alleged denial of due process, there is a certainty or a very strong likelihood that the application would have been granted"). This inquiry focuses not on the likelihood that the benefit would be conferred on the property owner, but whether a municipal official has discretion to confer that benefit. *See Clubside, Inc. v. Valentin*, 468 F.3d 144, 153 (2d Cir.2006) ("Since *RRI Realty*, we have consistently reaffirmed that our inquiry focuses on the extent to which the deciding authority may exercise *discretion* in arriving at a decision, rather than an estimate of the probability that the authority will make a specific decision." (emphasis in original) (internal quotation marks omitted)); *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir.1999) (noting that "entitlement turns on whether the issuing authority lacks discretion to deny the permit, *i.e.*, is required to issue it upon ascertainment that certain objectively ascertainable criteria have been met.").[16]

Plaintiffs claim that Mottarella's erroneous determination that he did not need to

---

**16.** "These standards have been crafted to strike the necessary balance between the landowner's need for constitutional protection and local governments' need to regulate matters of local concern." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 379 (2d Cir.1995). They also represent "an acknowledgment that . . . the Due Process Clause does not function as a general overseer of arbitrariness in state and local land-use decisions; in our federal system, that is the province of state courts." *Zahra*, 48 F.3d at 680. In other words, as the Supreme Court has made clear, "the due process guarantee does not entail a body of constitutional law imposing liability whenever somebody cloaked with state authority causes harm." *Lewis*, 523 U.S. at 848, 118 S.Ct. 1708.

involve the City Naturalist in connection with the work on the Gates property interfered with a "constitutionally protected property right ... in the wetland permit issued to them in 1994 and [in] the Schubert Wetland Project." (Am. Compl. ¶ 80.) Plaintiffs therefore appear to be claiming two distinct constitutionally protected property rights: one in preventing the work on the Gates property, the other in their own 1994 permit. As to the Gates property, the claim is that Mottarella's improper determination directly caused harm to Plaintiffs' property, and therefore Plaintiffs had an entitlement to a proper determination that the work on the Gates property was a regulated activity, and thus required a permit. These claims fall short on several levels.

■ First, as noted above, there is the serious question regarding the viability of Plaintiffs' asserted interest in stopping another property owner from engaging in certain land-use activities. "[M]ost due process challenges to land use regulations involve a property owner who has been denied a building permit or site plan or has had some other restriction placed on his own property." *Gagliardi,* 18 F.3d at 191–92. Here, there is no such claim as Plaintiffs are not complaining about being denied any permits, variances, or the like with respect to their property. Instead, Plaintiffs' theory is that they have a constitutionally protected interest in *preventing* municipal authorities from granting another property owner a certain use of his property under the land use regulations.

But, the Second Circuit has held that there is "no right to demand that [municipal officials] enforce the zoning laws." *Id.* at 192 (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,* 489 U.S. 189, 195, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) and *Heckler v. Chaney,* 470 U.S. 821, 832, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985)). Indeed, it long has been recognized that government officials retain wide discretion about enforcement decisions. *See Heckler,* 470 U.S. at 831, 105 S.Ct. 1649 (noting that "decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion"). Put another way, "there is no due process right in enforcing a law against another person." *Schwasnick v. Fields,* No. 08–CV–4759, 2010 WL 2679935, at *6 (E.D.N.Y. June 30, 2010); *see also Nemeth,* 2011 WL 56063, at *4 (holding that plaintiffs "have no constitutionally protected property interest in the 'benefit' of a Zoning code violation being issued by the Defendants against the [neighbors'] use of ... their property."). Consistent with this principle, New York courts have held that "the decision to enforce [land use] codes rests in the discretion of the public officials charged with enforcement." *Young v. Town of Huntington,* 121 A.D.2d 641, 503 N.Y.S.2d 657, 657–58 (1986); *see also Manuli v. Hildenbrandt,* 144 A.D.2d 789, 534 N.Y.S.2d 763, 764 (1988) ("[T]he law is by now quite well settled that the decisions of local municipal officials on whether to enforce zoning codes are discretionary and not subject to judicial oversight in a civil suit or by way of mandamus.").[17]

---

**17.** There also is the related, but separate question about whether Plaintiffs have a protectable interest in the procedures the City should have used to evaluate the work at the Gates property. Plaintiffs claim that Mottarella (and some of the other Defendants) violated their due process rights by short-cutting the procedures the Gates project should have been subject to under the City Code. Yet, as the Second Circuit has held, the "mere existence of *procedures* for obtaining a permit or certificate do not, in and of themselves create constitutional 'property interests.'" *Zahra,* 48 F.3d at 681–82 (emphasis in original). A contrary rule would invite "constitutional challenges at virtually every stage of the building process in municipalities." *Id.* at

Second, even if Plaintiffs retained a due process right to require enforcement of land use regulation against another property owner, their claim fails because they do not have an entitlement to prevent the work at the Gates property under the Rye City Code. Plaintiffs claim otherwise and focus on Mottarella's initial decision to allow the Gates work to proceed without further consultation with the City Naturalist. According to Plaintiffs, Mottarella had no discretion to allow the Gates work to proceed without consulting with the City Naturalist. In particular, the claim is that because the Gates work included the installation of a dry well and therefore was a "regulated activity" under the Rye City Code governing wetlands, Mottarella was required to refer the Gates application to the City Naturalist.[18] Indeed, the Code requires the City Engineer to refer a work proposal that involves regulated activity to the City Naturalist. *See* Rye, N.Y., Code, § 195–4 (providing that, in applications involving regulated activity, the City Engineer "shall, in the course of reviewing any application before [him], advise the applicant of the existence of this chapter and refer information regarding such applications to the City Naturalist."). However, even if Mottarella had referred the application to the City Naturalist, as the process is outlined in the Rye City Code, the City Naturalist had the discretion to determine whether the work was a "[u]se[ ] as of right," *id.* § 195–4D, which would not

require a permit, or a regulated activity, which would require one. *See id.* § 195–4B(1) ("The City Naturalist shall make one of two possible determinations: that the area may be subject to the requirements of this chapter or that the area is not subject to the requirements of this chapter."). Moreover, the Rye City Code provides for a right to appeal the Naturalist's determination, regardless of her decision. The appeal is decided by the Planning Commission, which must determine if the proposed land use is subject to the wetlands permit requirements. If the Planning Commission determines that the proposed land use is subject to these requirements, then the applicant may still apply for a permit that would allow for the proposed work. *Id.* § 195–4B(3) (providing that if the Planning Commission determines that the Naturalist properly determined the proposal to involve regulated activities "the property owner may complete the application by paying the permit application fee and submitting all other required permit information or withdraw the application").

The permit process also is spelled out in the Code and outlines the standards to be considered in determining whether to grant a permit. In particular, the Code provides that in "granting, denying or conditioning any permit, the Planning Commission shall evaluate the wetland functions and the role of the wetland in the hydrologic and ecological system and shall

682. Thus, the Second Circuit has declined to adopt "a rule that would obligate federal courts to consider endless numbers of alleged 'property interests' arising not from the benefits themselves, but as extensions of existing or sought property interests." *Id.* Regardless of the answer to this question, the Court finds Plaintiffs have failed to establish a protectable interest for the other reasons discussed herein.

**18.** The relevant provision of the Rye City Code spells out regulated activities involving

wetlands, which require a permit, and other activities where no permit is required. Examples of the former include "[p]lacement or construction of any structure," "[a]ny form of draining, dredging, excavation or removal of material either directly or indirectly," and, most relevant here, "[i]nstallation of any pipes or wells." Rye, N.Y., Code § 195–4C. Unregulated activities that may be conducted as a matter of right include "[r]epair of existing structures, including interior renovations, walkways, walls and docks." *Id.* § 195–4D.

determine the impact of the proposed activity upon public health and safety, rare and endangered species, water quality and additional wetland functions listed [elsewhere in the Code]." Rye, N.Y., Code § 195–5D. Among the factors to be considered are the impact of the proposed activity on "neighboring land uses and wetland functions," which itself requires consideration of a number of factors included in the Code. *Id.* § 195–5D(1)(a)[1]–[9]. The Code also provides for public hearings to consider a permit application. *Id.* § 195–5C.

■ Plaintiffs no doubt are confident that had Mottarella involved the City Naturalist, she would have determined that the Gates project required a permit, and that Plaintiffs would have persuaded the Planning Commission to deny any such permit. Assuming all this to be true, the Court nonetheless finds that Plaintiffs have not pled a constitutionally protected interest, because they have not established that they had a clear entitlement to prevent the Gates work from proceeding under the Code. Indeed, Plaintiffs have misdirected their focus on Mottarella's allegedly limited discretion in not involving the City Naturalist. The only impact of this decision is that it prevented the City Naturalist and the Planning Commission from exercising their discretion in determining whether the Gates work required a permit and, if so, whether it should be granted. Yet, as is clear from the Code, both decisions were within the discretion of the Naturalist and the Planning Commission. Nothing about the Code, in other words, pre-ordained that the Gates

work could not proceed, only that it might have required a permit. Where government officials have discretion in land use determinations, regardless of whether it could be predicted how they might exercise such discretion, "[n]o due process right[s are] implicated." *Gagliardi,* 18 F.3d at 192; *see also Clubside,* 468 F.3d at 158 (noting that where town board had "some discretion to determine whether to grant" a land use request, plaintiff had failed to establish a protectable property interest); *Overhoff v. Ginsburg Dev., L.L.C.,* 143 F.Supp.2d 379, 386 (S.D.N.Y. 2001) (noting that plaintiff had not demonstrated a claim of entitlement to have the government intervene and halt allegedly unlawful construction on neighboring property because the issuance of a stop-work order was "purely discretionary"). Accordingly, Plaintiffs have failed to establish that they have a protected interest in City of Rye officials denying permission for the work on the Gates property. *See Puckett v. City of Glen Cove,* 631 F.Supp.2d 226, 238–239 (E.D.N.Y.2009) ("There can be no question but that Defendants possessed the discretion to grant or deny the permit sought by Frog Hollow. This discretion negates the argument that Plaintiff has a constitutionally protected property interest in the denial of a permit to her neighbor.").[19]

Third, Plaintiffs' assertion that their 1994 wetland permit is a protectable interest is lacking legal support. While it may be that the City's decision to allow the Gates work to proceed might have adversely affected Plaintiffs' use of their

---

19. That the Code grants the Naturalist and the Planning Commission discretion to grant a permit for the type of work proposed by the Gates distinguishes this case from the cases relied upon by Plaintiff, as they involved situations where town officials had little to no discretion. *See Walz v. Town of Smithtown,* 46 F.3d 162, 168 (2d Cir.1995) (noting that

town official's discretion to deny permit was "so circumscribed" that plaintiffs possessed an entitlement to it); *Town of Orangetown v. Magee,* 88 N.Y.2d 41, 643 N.Y.S.2d 21, 665 N.E.2d 1061, 1067–68 (1996) (noting that property owners had established entitlement to property use when they were granted a permit that was unlawfully revoked).

property, a claim the Court is willing to assume for these purposes, nothing about that fact affects the *permit* Plaintiffs possess. Plaintiffs may still use their property in a way consistent with their permit, regardless whether their ability to do so might be affected by the Gates work. *See W. Farms Assocs. v. State Traffic Comm'n*, 951 F.2d 469, 473 (2d Cir.1991) (holding that plaintiff's interest in its traffic certificates would not be affected by granting of similar certificates to competitor). And, the caselaw is clear that Plaintiffs' permit is itself not a protectable interest that can be the foundation for a due process right of the sort claimed here—an ancillary right to stop a neighbor from making lawful, or even unlawful, use of its own property. *See id.* (holding that even if traffic certificate holder might suffer financial consequences if a competitor were granted a similar certificate, state law had "not established protection from competition as a property right"); *see also Zahra*, 48 F.3d at 681–82 (holding that there was no property interest in inspection necessary for completion of a project for which plaintiff held a permit); *Tara Circle, Inc. v. Bifano*, No. 95–CV–6522, 1997 WL 399683, at *10–11 (S.D.N.Y. July 15, 1997) (no due process interest in "ancillary actions" related to special land use permit plaintiff already had been granted).

### D. Procedural Due Process

In their second cause of action, Plaintiffs assert a violation of their procedural due process rights. The Supreme Court has held that courts are to examine "procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Ky. Dep't. of Corr. v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) (citations omitted).

Because, for the reasons just discussed, Plaintiffs have failed to plead a constitutionally protected property interest, this claim fails as well. *See Gagliardi*, 18 F.3d at 193 ("Since the Gagliardis lack a property interest in the enforcement of the ... zoning laws, they are unable to state an actionable claim for deprivation of procedural due process."); *RR Vill. Ass'n v. Denver Sewer Corp.*, 826 F.2d 1197, 1201–02 (2d Cir.1987) (holding that "if state law makes the pertinent official action discretionary, one's interest in a favorable decision does not rise to the level of a property right entitled to procedural due process protection.").

### E. First Amendment Retaliation

Plaintiffs' third cause of action alleges that Defendants retaliated against them in violation of their First Amendment rights, through Shew's reporting of Schubert to CPEP for mental evaluation and the City Council's decision to retain a hydrologist and its subsequent alleged refusal to provide redress for the wrongful decision not to require a permit for the work done on the Gates property. Because the claims against Shew and the City Council contain different elements, the Court addresses each separately.

Generally, in order to state a claim for First Amendment retaliation, a private citizen normally must allege that: "(1) he has an interest protected by the First Amendment; (2) [the] defendants' actions were motivated by or substantially caused by his exercise of that right; and (3) [the] defendants' actions effectively chilled the exercise of his First Amendment right." *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir.2001) (citing *Connell v. Signoracci*, 153 F.3d 74, 79 (2d Cir.1998)); *see also Zherka v. Amicone*, 634 F.3d 642, 644–46 (2d Cir.2011) (noting the requirement that private citizens normally must demonstrate "actual chill" in

their speech to establish a First Amendment retaliation claim). As to Shew, even assuming for purposes of these motions that Plaintiffs have satisfied the first two elements of this claim, Plaintiffs have not alleged facts that are sufficient to demonstrate that their First Amendment rights have been chilled. In order to make the requisite showing, Plaintiffs must allege that the retaliatory conduct either silenced them, or had some "actual, non-speculative chilling effect on [their] speech." *Williams v. Town of Greenburgh,* 535 F.3d 71, 78 (2d Cir.2008) (quoting *Colombo v. O'Connell,* 310 F.3d 115, 117 (2d Cir.2002) (internal quotation marks omitted)); *see also Lukowski v. Cnty. of Seneca,* No. 08–CV–6098, 2009 WL 467075, at *7 (W.D.N.Y. Feb. 24, 2009). In light of the allegation in the Amended Complaint, that "[n]otwithstanding the Defendants' attempted cover-up of their own wrongdoing in permitting the work on the Gates Property to go forward without a permit ..., the Plaintiffs, and in particular Plaintiff Robert Schubert attended and continued to attend Rye City Council Meetings on a regular basis" in order to complain about Defendants' conduct (Am. Compl. ¶ 61), Plaintiffs cannot plausibly claim that they were actually silenced or that their speech was chilled as a result of Shew's actions. (*See* Decl. in Supp. of Rye Defs.' Mot. to Dismiss ("Corsi Decl.") Exs. E, G, H, N, O.) *See Curley,* 268 F.3d at 73 ("Where a party can show no change in his behavior, he has quite plainly shown no chilling of his First Amendment right to free speech."). Indeed, Plaintiffs' dispute with the City of Rye, and in particular the alleged activities of Defendant Shew in contacting personnel at the CPEP, subsequently were the subject of a feature article in the New York Times,

which contained several quotes from Schubert describing his complaints to City of Rye officials and Shew's alleged efforts to report Schubert's supposed psychiatric issues, further demonstrating that Plaintiffs' speech was not chilled in the least.[20] (*See* Corsi Decl. Ex. X.) Therefore, because Plaintiffs' own allegations and other materials properly considered in this motion demonstrate that Plaintiffs cannot plausibly claim that their speech was chilled, their First Amendment retaliation claim against Shew is dismissed.

■ Plaintiffs' First Amendment retaliation claim concerning the actions of the Mayor and the City Council requires a slightly different analysis. While a plaintiff seeking to establish a First Amendment retaliation claim must typically allege some chilling of his speech, "in limited contexts, other forms of harm have been accepted in place of this actual chilling requirement." *Zherka,* 634 F.3d at 645 (internal quotation marks omitted). One of those contexts involves situations where the alleged retaliation consists of failure to enforce zoning laws. For example, in *Gagliardi,* a case where the plaintiffs alleged retaliation in the form of failure to enforce local zoning laws, "the plaintiffs' retaliation claim apparently survived a motion to dismiss because ... they adequately pleaded non-speech injuries," which consisted of damage to their ability to enjoy their property. *Gill v. Pidlypchak,* 389 F.3d 379, 383 (2d Cir.2004). Here, Plaintiffs have alleged that their property has been damaged by Defendants' alleged retaliatory failure to enforce local land-use regulations and correct the damage which resulted from Mottarella's initial determination that the work on the Gates property did not require a permit. Therefore, Plaintiffs

---

**20.** The Court may take judicial notice of the New York Times article. *See Condit,* 317 F.Supp.2d at 357–58 (taking judicial notice of newspaper articles submitted by defendant in conjunction with his motion to dismiss, but only "for a limited purpose" and not for the truth of the articles' content).

need not demonstrate actual chilling of speech. *See also Puckett,* 631 F.Supp.2d at 240 (applying the *Gagliardi* standard in case involving alleged failure to enforce local zoning laws).

■■■ To succeed on their First Amendment retaliation claim here, therefore, Plaintiffs must plausibly allege that their "conduct was protected by the [F]irst [A]mendment, and that [D]efendants' conduct was motivated by or substantially caused by [their] exercise of free speech." *Gagliardi,* 18 F.3d at 194 (citations and internal quotation marks omitted). It is indisputable that Plaintiffs' right to complain to government officials and to seek redress is protected by the First Amendment. *See id.* at 194–95; *see also Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals,* 282 F.3d 83, 91 (2d Cir. 2002) ("The rights to complain to public officials and to seek administrative and judicial relief from their actions are protected by the First Amendment."). What remains, then, is whether Plaintiffs have plausibly alleged that Defendants' conduct was "substantially caused" by Plaintiffs' exercise of that right.

In contrast to the specific allegations of misconduct by the defendants in *Gagliardi,* the Court finds that Plaintiffs' conclusory and inconsistent allegations do not plausibly state a claim of First Amendment retaliation. In *Gagliardi,* the plaintiffs alleged that they began their protected activities in 1981, when a corporation which owned adjacent property first violated local land use regulations (and breached an agreement with the defendant village), and that defendant municipal officials thereafter not only failed to enforce a noise ordinance after its enactment in 1985, but also granted permits to the corporate property owner in 1985 and 1986 and approved a damaging property swap in 1990. 18 F.3d at 189–91. These "detailed allegations," the court held, provided a "chronology of events from which an inference [could] be drawn that actions taken by the Municipal Defendants were motivated by or substantially caused by the Gagliardis' exercise of their First Amendment rights." *Id.* at 195.

In contrast with *Gagliardi,* where plaintiffs detailed defendants' decade-long course of conduct where they improperly allowed activities by an adjacent corporation to proceed in violation of local land-use regulations, and affirmatively approved and gave licenses for improper work, Plaintiffs' allegations here make clear that the allegedly improper work on the Gates property took place well before Plaintiffs made any complaints to Defendants. In fact, though the Amended Complaint is stingy with dates, Plaintiffs allege that they learned in June 2006 that the Gateses had hired an engineering consultant to address water drainage on their property (Am. Compl. ¶ 25), and that soon thereafter Schubert wrote to the Chair of the City of Rye Planning Commission (who is not a defendant in this case) to address his concerns about this rumored development, (*id.* ¶ 26). According to Plaintiffs, in August 2006 Gates in fact hired the engineer with the allegedly "improper relationship" with Defendant Mottarella, who submitted the permit application for the drainage work to Mottarella. (*Id.* ¶¶ 27, 35.) The Amended Complaint is silent as to exactly (or even approximately) when the allegedly improper work was completed on the Gates property, but it does allege that within one week of its completion the damage to Plaintiffs' property was inflicted. (*Id.* ¶ 47.)[21] Nonetheless, it is

---

**21.** In a letter to the Court in connection with the pending motion, Plaintiffs' counsel has relayed facts suggesting that the improper work was done in February 2007 (*see* Letter from Steven H. Gaines, Esq., to the Ct. (Sept. 17, 2010) at 2–3), though the Court will only

clear that the work and the allegedly corresponding damage to Plaintiffs' property had occurred by the time Plaintiffs claim they lodged their objections about the work (and Mottarella's decision to allow it to go forward without a permit) with Defendants.[22] And, while the Amended Complaint offers no details of when Schubert first complained to Defendants, it does not allege any retaliatory conduct ·by moving Defendants until March 2009, when the City Council (with the support of Mayor Otis) retained the hydrologist, allegedly just to dispute Plaintiffs' claims about the Gates work. (*Id.* ¶ 74.) In fact, the entirety of Plaintiffs' claim is that Defendants hired the hydrologist to cover up "Defendant City's actions and inactions with respect to the work to be performed on the Gates Property ... and to retaliate against the Plaintiffs for voicing their complaints against the Defendants." (*Id.*)

Although "[t]he ultimate question of retaliation involves a defendant's motive and intent, which are difficult to plead with specificity in a complaint," *Gagliardi*, 18 F.3d at 195, and as such may be difficult to decide on a motion to dismiss, *Puckett*, 631 F.Supp.2d at 240, Plaintiffs' amorphous allegations are insufficient. Unlike in *Gagliardi*, Plaintiffs have not alleged a single decision by Mayor Otis or the Defendant City Council Members to allow Gates to do any work on the property after Plaintiffs raised their complaints. At most, Plaintiffs are merely alleging that their complaints to somehow undo the Gates work were ignored by Defendants. *See Gagliardi*, 18 F.3d at 195 (outlining detailed allegations of alleged systematic, selective enforcement of zoning laws after protected

activity occurred). Yet, the City of Rye was not obligated to act upon Plaintiffs' requests for redress. *See Prestopnik v. Whelan*, 253 F.Supp.2d 369, 375 (N.D.N.Y. 2003) ("The right to petition the government does not create in the government a corresponding duty to act." (quoting *Cronin v. Town of Amesbury*, 895 F.Supp. 375, 389–90 (D.Mass.1995), *aff'd*, 81 F.3d 257 (1st Cir.1996))); *Osborne v. Fernandez*, No. 06–CV–4127, 2009 WL 884697, at *44 (S.D.N.Y. Mar. 31, 2009) (noting that issue of whether public officials acted on plaintiffs' grievances was "a separate matter that does not retain a constitutional dimension"); *Stengel v. City of Columbus*, 737 F.Supp. 1457, 1459 (S.D.Ohio 1988) (recognizing that government has no duty to act). And, no reading of *Gagliardi* suggests that a disgruntled plaintiff has a viable retaliation claim merely because a government official declines to remedy every wrong identified by that plaintiff.

Moreover, Plaintiffs' general allegations attempting to ascribe an actionable motive to moving Defendants fail. In fact, in the two instances Plaintiffs allege retaliation, both in connection with the commissioning of the hydrologist's report and the hydrologist's adverse conclusion, Plaintiffs merely allege that Defendants acted to cover up their "actions and inactions with respect to the work performed on the Gates property ... and to retaliate against the Plaintiffs" for "voicing their complaints against the Defendants." (Am. Compl. ¶¶ 74, 76.) Not a single fact is alleged that plausibly supports an inference of retaliatory motive that can be drawn from Defendants' decision not to accede to Plaintiffs' request, rendering these boilerplate allegations in-

take into consideration what is alleged (or not alleged) in the Amended Complaint.

**22.** For example, the Amended Complaint alleges that Schubert "attended public City Council meetings in an effort to voice his

objections to the work performed on the Gates Property and demand that the Defendant City review the work undertaken and restore the wetland so as to re-charge and restore the Schubert Wetland Project." (Am. Compl. ¶ 52.)

sufficient, particularly post-*Twombly* and *Iqbal. See Rosendale v. Brusie*, No. 07–CV–8149, 2009 WL 778418, at *9 (S.D.N.Y. Mar. 25, 2009) (dismissing plaintiff's claim after failing to find retaliatory motive, where plaintiff made "only vague and conclusory allegations in support of his contention that [d]efendants failed to enforce land use regulations ... because of his protected speech"); *Geiger v. Town of Greece*, No. 07–CV–6066, 2007 WL 4232717, at *9 (W.D.N.Y. Sept. 4, 2007) (dismissing retaliation claim supported by insufficient and conclusory allegations of causation); *see also Butler v. City of Batavia*, 323 Fed.Appx. 21, 23 (2d Cir.2009) (summary order) (noting that Plaintiffs' complaint was "devoid ... of any factual allegations lending to show that defendants' decision not to act on plaintiffs' reports was motivated" by plaintiffs earlier protected activity (internal quotation marks omitted)).[23] This conclusion is buttressed by the fact that Plaintiffs' general allegations themselves admit to another motive by Defendants—allegedly to cover up the City's earlier, and in Plaintiffs' view improper, decision to allow the Gates work to have been done in the first place. In the end, the combination of the vague and contradictory allegations by Plaintiffs is fatal to their retaliation claim. *See Grossi v. City of New York*, No. 08–CV–1083, 2009 WL 4456307, at *9 (E.D.N.Y. Nov. 30, 2009) (noting that Plaintiffs "simply surmise[d]" retaliatory motives, and that

Plaintiffs' allegations of retaliatory intent were contradicted by other allegations suggesting ulterior motives for defendants' conduct); *see also Gagliardi*, 18 F.3d at 195 (noting that "a bald and uncorroborated allegation of retaliation might prove inadequate to withstand a motion to dismiss"). Therefore, because Plaintiffs have failed to establish that Defendants' alleged conduct was substantially caused by Plaintiffs' exercise of their free speech rights, their First Amendment retaliation claims are dismissed.

### F. Intentional Infliction of Emotional Distress

Plaintiffs' final claim is for intentional infliction of emotional distress, alleging that Shew's contacting CPEP regarding Schubert's mental state constituted extreme and outrageous conduct. Because the Court dismisses all of Plaintiffs' federal claims, the Court declines to exercise supplemental jurisdiction over this state law claim. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction."); *see also Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (noting that decision whether to exercise supplemental jurisdiction lies within the discretion of the district court). Therefore, Plaintiffs' claim for intentional

---

**23.** Similar to Defendants' retention of the hydrology firm in this case, the defendants in *Puckett* hired several engineering firms to conduct studies that concluded that the construction work that the plaintiffs were contesting could continue without harming any property. As in this case, the *Puckett* plaintiffs claimed that it was predetermined that one of these firms would reach a conclusion that would be favorable to the defendants. *Puckett*, 631 F.Supp.2d at 232. Unlike *Puckett*, however—where the engineering firm was allegedly hired for the *prospective* purpose of continuing the allegedly unlawful construction—here, the hydrology firm was retained by the City Council for the *retrospective* purpose of determining the cause of the damage to Plaintiffs' property. In no sense was Defendants' hiring of the hydrology firm part of a plan to retaliate against Plaintiffs for exercising their First Amendment rights by authorizing additional land use transgressions. Plaintiffs have offered no suggestion that Defendants made any such use of the hydrologist's report.

infliction of emotional distress is dismissed without prejudice to refiling in state court.

### III. Conclusion

For the reasons stated herein, Defendants' motions to dismiss are granted. Plaintiffs' federal claims are dismissed with prejudice, and supplemental jurisdiction over Plaintiffs' state law claim is declined.[24] The Clerk of the Court is respectfully directed to terminate the pending motions (Dkt. Nos. 18, 20), and to close the case.

SO ORDERED.

---

**24.** Plaintiffs have already had one opportunity to amend their claims, and the Court finds this to be sufficient. *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co.,* No. 08–CV–7508, 2009 WL 3346674, at *2 n. 14 (S.D.N.Y. Oct. 15, 2009) (citing cases dismissing claims with prejudice where plaintiff's had previously been afforded opportunities to amend).